OPINION OF THE COURT
Richard A. Dollinger, J.
In this matter, a couple spar over the question of when a retirement account should be valued for equitable distribution purposes. As with many legal decisions, it depends on how a court interprets an agreement in which the language chosen confuses the exact nature of what was intended.
The facts are undisputed: in May 2009, the couple executed a separation and property settlement agreement (the agreement). The agreement provided that the husband had a pension plan with a current value of approximately $280,000. The *305 parties agreed that the wife would be entitled to a marital share of said pension account, in accordance with the formula set forth in the Majauskas case, pursuant to a qualified domestic relations order (QDRO).[1] The couple changed the traditional Majauskas formula to reduce the wife’s share from 50% of the marital property portion to 40%. Importantly, the agreement also stated in a later paragraph: “They agree that no property presently owned by them or hereafter acquired by them or either of them during the marriage shall be or become marital property within the meaning and intent of said statute, unless expressly designated by them as marital property by an agreement in writing.” The couple agreed that all property owned by them from the date of the agreement forward would be “unequivocally separate property including any increases thereto whether or not by the direct or indirect contributions of either the husband or wife alone or in conjunction with one another.” Finally, the agreement provided:
“Separate property shall apply with like force and effect to any increase in the value of said property, including any exchange of said property for other property, whether by purchase, reorganization merger or otherwise. It is the unequivocal intent of the parties that they opt out of Domestic Relations Law section 23 [6] (B) as respects marital property or any increases, changes, exchanges or other modifications of their separate property even though said property or increases thereto may have occurred subsequent to the physical separation of the parties.”
The couple’s action for divorce was not commenced until June 2012, more than three years later.
After the divorce was completed, the wife sought to have a QDRO signed in 2015 — six years after the agreement and three years after the judgment of divorce. In the order, the wife valued the account at the date of commencement of the action. The husband objected, arguing that the wife’s share of the account was fixed on the date of the execution of the agreement, and further, that because the agreement lacks any reference to gains or losses since the date of the signing, the wife’s interest was frozen at her agreed percentage of the account on the date of the agreement.
*306 Domestic Relations Law § 236 (B) (1) (c) defines marital property as all property acquired “during the marriage and before the execution of a separation agreement or the commencement of a matrimonial action.” (Mesholam v Mesholam, 11 NY3d 24, 28 [2008].) Thus, in the absence of a separation agreement, the commencement date of a matrimonial action demarcates “the termination point for the further accrual of marital property.” (Mesholam v Mesholam, 11 NY3d at 28; see also Anglin v Anglin, 80 NY2d 553, 556 [1992].) In a review of the legislative intent, the legislature gave couples an option during their marriage: they could by agreement decide that certain assets, acquired during the marriage, would not be considered marital property. When they elected to separate — or conceivably at any other time prior to commencing a divorce action — the couple could terminate the accrual of marital property by agreement.
However, to qualify as an exception to the broad “marital property” definition in the Domestic Relations Law or to qualify as a waiver of marital rights under that statute, the intent of the parties that otherwise marital property would remain separate property upon dissolution of the marriage “must be clearly evidenced by the writing.” (Tietjen v Tietjen, 48 AD3d 789, 791 [2d Dept 2008].) The parties’ intent is generally gleaned from what is expressed in their writing. (Van Kipnis v Van Kipnis, 11 NY3d 573, 577 [2008].) The intent to override the rules of equitable distribution — whether by express waiver, or by specifically designating as separate property assets that would otherwise be considered marital property under New York law — must be clearly evidenced by the writing. (Id.; see also Cohen-McLaughlin v McLaughlin, 132 AD3d 716 [2d Dept 2015] [an express and valid waiver of marital rights needed].)
In this matter, both parties argue about the meaning of the language of the agreement and whether it restricts the wife’s access to any further accumulation in the account. One salient factor emerges for this court: nowhere does the agreement explicitly state that the wife’s share is determined and the agreement never explicitly defines the wife’s “marital share” as excluding gains or losses on the account. The husband can point to the “catch-all” paragraph, set forth above, which follows the paragraph allocating the marital share. In that later paragraph, the agreement details that no property “presently owned by them” or thereafter “acquired” by either of them “shall be or become” marital property, and adds that only *307 “marital property” which is “expressly designated” by them shall be subject to equitable distribution. In the next paragraph, the couple again mention that “all property owned by the parties” currently or “from this day on” would be “unequivocally separate property including any increases thereto” regardless of how such increases occurred. The agreement then states an “unequivocal intent” that the parties are opting out of Domestic Relations Law § 236 (B) (6) as it relates to “any increases . . . of their separate property even though said . . . increases thereto may have occurred subsequent to the physical separation of the parties.”
However, the court declines to interpret this language as an explicit waiver of the wife’s right to claim an increase in the fund as marital property which accrued after the signing of the agreement. It is undisputed that the wife, at the time of the signing of the agreement, did not “own” the share of the retirement account. She also did not “acquire” the marital share in the retirement account at the time of the agreement. “Acquire” means “to come to own (something).”[2] While the wife, at the time of the signing of the agreement, has a right to claim the marital share of the retirement plan and further held this right to claim her marital share during the remainder of the marriage, the wife still did not have title to the asset, and by virtue of the lack of a QDRO, does not, even now, “own” the marital share in the account. Therefore, the words “no property . . . shall be or become marital property,” do not govern the disposition of the wife’s claim to the marital share of the retirement account.
In the following paragraphs, the husband and wife’s use of the word “owned” also colors this court’s interpretation of the impact of this paragraph on the husband’s claims. The wife did not “own” the marital share of the husband’s retirement account when the agreement was signed; the husband still “owned” it subject to her “marital share.” Because the share was not owned by the wife, the language which would otherwise restrict her claim to either gains or losses stemming from the date of the agreement does not apply to thwart her claim to any increase in the pension fund.
The wife, in seeking to share in any post-agreement increase in the account, cites cases which suggest that courts have *308 “improvidently” selected dates prior to the date of commencement to value defined contribution accounts. (Curley v Curley, 125 AD3d 1227, 1230 [3d Dept 2015].) But, in the cited case, there was no separation agreement executed, as exists in this case. In other cases, the New York courts have determined valuation dates — other than the date of commencement — if, for example, the agreement provided that the QDRO would be filed contemporaneously with the judgment of divorce. (Ernst v Ernst, 8 AD3d 331 [2d Dept 2004] [held that the valuation date was the date of judgment not when the QDRO was issued]; Demjanenko v Demjanenko, 79 AD3d 1754 [4th Dept 2010] [agreement provided that funds would be equalized and hence, the funds, plus or minus losses or gains, would be valued at the date of distribution].) In this case, the couple did not agree on the date that the account would be valued. They simply agreed on its approximate value and established a method for distributing the wife’s share at a subsequent time. The agreement does not expressly confine the wife’s interest to 40% of the then-agreed valuation of $280,000 or $112,000 as the husband repeatedly contends.
Here, the focus of the court’s inquiry shifts because it is unclear whether the referenced account is a pension (a defined benefit plan) or a defined contribution plan (such as an IRA or 401 [k] plan). The agreement makes reference to a “pension plan,” but then includes an approximation of the current value of the plan ($280,000). If the account is a true defined benefit plan — a traditional pension plan paid out in monthly allotments after retirement — then its value on the date of the agreement is not pertinent because, under the agreement, the parties elected to use the coverture fraction set forth in Majauskas to value the wife’s pension interest. Under that formula, the monthly benefit, payable at the time of retirement, is multiplied by the coverture fraction and the agreed percentage share (40%) and that combined fraction is applied against the monthly benefit. Under Majauskas, any gains or losses subsequent to the separation agreement or the divorce — or changes in the final average salary of the participant — change the payout to the nonparticipant. Therefore, if the fund is a defined benefit pension plan, the wife, under the application of the formula, shares in any post-separation increases in the pension payout.
The equation changes if the plan is not a true defined benefit plan and instead is a defined contribution plan, such as a *309 traditional individual retirement account or 401(k) plan. Because the account in this case is described as having a fixed amount, this court is inclined to conclude that the referenced account is a defined contribution retirement fund and not a defined benefit plan. The distinction is important. Under classical equitable distribution rules applied in many states, the marital shares of a defined contribution plan are divided pursuant to a tracing method. (In re Marriage of Walls & Peasley, 2007 WL 242355, *11 n 12, 2007 Cal App Unpub LEXIS 753, *33 n 12 [Jan. 30, 2007, No. H028863] [discussion of tracing method of valuing retirement accounts]; Forman v Forman, 2014-Ohio-3545 [3d Dist, Aug. 18, 2014], http:// www. supremecourt.ohio.gov/rod/docs/pdf/3/2014/2014-Ohio-3545.pdf [discussion of tracing method of valuing retirement benefits versus the coverture formula]; Bernstein v Bernstein, 1999 WL 826145, *2, 1999 Ark App LEXIS 679, *7 [Oct. 13, 1999, No. CA 99-70] [using tracing method to value marital interest in IRA]; Muir v Muir, 406 SW3d 31, 35 [Ky Ct App 2013] [using tracing method to equitably distributed deferred compensation retirement benefits].) Under this approach, a court traces the funds contributed during the marriage — the marital contributions or “share” — then traces the increases/ decreases in value and the non-titled spouse gets his or her “marital share” of the funds contributed during the term of the marriage until the date of commencement. (See e.g. L.R. v C.R., 44 Misc 3d 1208[A], 2014 NY Slip Op 51057[U] [Sup Ct, Richmond County 2014] [wife is awarded 50% share of marital contributions to 401(k) accounts and deferred compensation accounts]; Kilkenny v Kilkenny, 54 AD3d 816, 820 [2d Dept 2008] [marital share was 50% of funds in the account on the date of commencement minus separate property contributed]; Fleischmann v Fleischmann, 24 Misc 3d 1225[A], 2009 NY Slip Op 51614[U] [Sup Ct, Westchester County 2009] [divided 401(k) and defined contribution plans by allocating 50% of marital share].)
In this instance, if the plan is a defined contribution plan, the agreement requires that the Majauskas formula be applied to that account, even if the application produces a somewhat awkward result. In Jennings v Brown (43 Misc 3d 1229[A], 2014 NY Slip Op 50858 [U] [Sup Ct, Seneca County 2014]), the court notes that while a small minority of cases have used the time-based Majauskas coverture fraction to determine the marital share of a defined contribution plan, it
*310 “may be preferable that 40 IK accounts and IRA accounts be divided by the tracing methodology as opposed to the use of a coverture fraction as called for in Majauskas, it does not mean that this cannot be done, and here, the language on how the account in question was to be divided in the parties’ judgment of divorce is unequivocal.” (Jennings v Brown, 43 Misc 3d 1229[A], 2014 NY Slip Op 50858[U], *3.)
Two Appellate Divisions, including the Fourth Department, have approved this approach when an agreement expressly applies Majauskas to a defined contribution plan. (McCarthy v McCarthy, 57 AD3d 1481 [4th Dept 2008]; McGrath v McGrath, 261 AD2d 369 [2d Dept 1999] [with no discussion, dividing an IRA using a coverture fraction].) Importantly, other state courts have criticized utilizing the “coverture fraction” to value defined contribution plans because of the danger that it will produce an unjust result:
“As we have previously indicated, the coverture fraction is an inappropriate method to determine the marital share of a defined contribution plan. (‘Applying [the coverture] fraction to a defined contribution plan could lead to incongruous results, and such an approach is not generally used. Proration of a defined contribution plan is typically accomplished by tracing separately contributed funds.’ (citation omitted)); see also Brett R. Turner, Equitable Distribution of Property § 6:24 (3d ed. 2005) (explaining why ‘[i]t is generally error to classify a defined contribution retirement plan using the time-based coverture fraction used to classify defined benefit plans,’ and why ‘[application of a time-based coverture to defined contribution plans creates a significant risk of reaching unjust results’).” (Prizzia v Prizzia, 58 Va App 137, 168, 707 SE2d 461, 476 [2011] [citation omitted], citing Mann v Mann, 22 Va App 459, 465 n 6, 470 SE2d 605, 607 n 6 [1996].)
In this case, the use of the Majauskas formula may produce such a result. The initial portion of the formula dictates that the numerator in the coverture equation would be defined as the number of months from the date of the marriage to the date of the execution of the separation agreement. Calculating the denominator in the Majauskas formula for a defined contribution plan is a bit trickier and was not discussed in the *311 analysis in Jennings v Brown. In the Majauskas formula, the denominator is the number of years (or months) that the participant was a participant in the retirement plan. (Majauskas v Majauskas, 61 NY2d 481 [1984]; Hughes v Hughes, 79 AD3d 473 [1st Dept 2010] [applying the Majauskas formula and including all increases to such amount from the date of commencement to the date of distribution].) Therefore, in calculating the wife’s interest in this instance, the denominator would be the total number of months that the husband participates in the plan up to the time of retirement, or when the husband ceases to be employed by the sponsoring employer.
Because the Majauskas formula for a defined benefit plan is based on a time-in-marriage versus time-in-participation calculation, the actual value of the nonparticipant’s share is not determined until the time when the benefits begin to be paid out. In those circumstances, the nonparticipant’s benefits are paid as a percentage of the total payout and not as a fixed value. However, under the application of the Majauskas formula to a defined benefit plan, the nonparticipant shares in the growth of the payout, even after his or her percentage share is fixed by the coverture fraction or, as in this case, the multiplier. Increases in the fund available for distribution— and which accrued after the divorce or separation agreement— still benefit the nonparticipant. Simply put, in a defined benefit plan, the amount available for distribution gets larger as the available funds grow (usually through post-divorce salary increases, but also through growth of the fund) even though the nonparticipant’s percentage share may decline because the added months of service by the participating spouse reduce the wife’s percentage share.
Based on this couple’s invocation of the Majauskas formula in their agreement, the calculation of the wife’s share is not undertaken until distribution of the funds and then the formula — the number of months of the marriage while participating in the plan over the total term of the spouse’s participation in the plan, multiplied by 40% — is applied to the sum available at the time of the distribution. In short, the gains or losses in the fund from the date of the separation agreement — as well as any contributions made after the separation agreement up to the time of the distribution — constitute the sum against which the formula is applied.
To salvage his argument, the husband advances an additional claim: he suggests that the agreement’s lack of any *312 reference to gains or losses confines the application of the Ma-jauskas formula in this instance. He argues that having omitted this phrase, this court, cannot, by interpretation, insert it to enhance the wife’s interest. To resolve this question, the court concedes that the stipulation of settlement in this case is a contract subject to principles of contract construction and interpretation. (Kraus v Kraus, 131 AD3d 94, 100 [2d Dept 2015].) Furthermore, the rules of construction are rigorously applied when the distribution of pension benefits between former spouses is accomplished through a QDRO obtained pursuant to a stipulation because such QDRO can convey only those rights to which the parties stipulated as a basis for the judgment. (Berardi v Berardi, 54 AD3d 982, 985 [2d Dept 2008], quoting McCoy v Feinman, 99 NY2d 295, 304 [2002].) This court cannot issue a QDRO if it means “encompassing rights not provided in the underlying stipulation” or is more expansive than the stipulation. (Coulon v Coulon, 82 AD3d 929, 929-930 [2d Dept 2011].)
In this matter, the agreement, in addressing the distribution of the retirement asset, makes no reference to “gains or losses.” That omission should be decisive: not having distributed gains and losses in their agreement, the QDRO cannot distribute these post-separation consequences — favorable or unfavorable — on the wife’s marital share. However, the invocation of the Majauskas formula, as the method to calculate the wife’s marital share, trumps that omission. Under Majauskas, the value of the wife’s marital share is not determined until after the date of the QDRO when the husband accesses his retirement account for distribution. At that point, the wife’s interest has a value as dictated by the formula on the corpus of the then-existing retirement asset. Therefore, any gains or losses, incurred after the separation agreement, but before the calculation of the Majauskas share, are included in the value of the wife’s interest. By invoking Majauskas as the method of calculating the wife’s interest, the parties intended that the value of the wife’s share would only be determined at the time of the distribution and hence, any gains or losses prior to that date, are included within her interest.
In conclusion, this couple, by electing to use the Majauskas language in their agreement, abandoned the more-commonly-used tracing method and dictated that the coverture fraction and a preselected marital multiplier would be used to calculate the wife’s share at the time of the husband’s discontinuing his *313 participation in the plan or the date that the wife files an order seeking distribution of the fund, whichever last occurs. This court declines to overrule the couple’s selection of the Majaus-kas formula — with post-agreement gains or losses included — to govern the distribution of this marital asset.
Under these circumstances, the court holds: (a) if the referenced plan is a defined benefit plan, then the wife’s interest is calculated using the Majauskas formula as dictated by the agreement and she is entitled to her percentage of any monthly benefit or payout from the plan, commencing on the husband’s date of retirement; (b) if the referenced plan is a defined contribution plan, then when the husband ceases or ceased to participate in the plan or when the wife files an order seeking her share of the fund, whichever last occurs, the value of the account shall be determined at its fair market value and wife’s share shall be calculated by using the coverture fraction — the number of months that the couple were married while he participated in the plan divided by the total number of months he participated in the plan multiplied by 40% and such amount shall be transferred to the wife through a qualified domestic relations order.

. Majauskas v Majauskas, 61 NY2d 481 (1984).

. Merriam-Webster Online Dictionary, acquire (http://www.merriam-webster. com/dictionary/aequire).